UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JOHN CHARLES RAYSHAWN SMITH,

                Petitioner,

v.                                                    CASE NO. 10-12562
                                                      HONORABLE MARIANNE O. BATTANI
MARY BERGHUIS,

                Respondent.
_____/

## OPINION AND ORDER
## DENYING THE HABEAS CORPUS PETITION,
## DENYING A CERTIFICATE OF APPEALABILITY, BUT
## GRANTING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

Petitioner John Charles Rayshawn Smith has filed a pro se habeas corpus

petition challenging his state conviction for two counts of first-degree (felony) murder.

He challenges the sufficiency of the evidence adduced at trial, the delay in acquiring a

defense expert witness, and the admission of an informant's testimony about his

(Petitioner's) alleged confession.  Respondent Mary Berghuis urges the Court through

counsel to deny the petition.  She argues that Petitioner's claims lack merit or are

procedurally defaulted.  The Court agrees that Petitioner is not entitled to habeas

corpus relief.  Accordingly, the petition must be denied.

## I.  BACKGROUND

**A.  The State Court Proceedings**

Petitioner was charged with two counts of first-degree (felony) murder, Mich.

Comp. Laws § 750.316(1)(b), and one count of arson of a dwelling house, Mich. Comp.

Laws § 750.72.  The charges arose from allegations that, on May 8, 2005, Petitioner set fire to a four-unit apartment building at 7627 Poe Street in Detroit.  Petitioner had been living in the building with his mother and his mother's male companion.  The three of them evacuated the building unharmed, as did another resident, but a married couple that lived on the second floor of the building died of smoke inhalation.

Winston Farrow's Testimony

Petitioner was tried without a jury in Wayne County Circuit Court.  The first witness was Lieutenant Winston Farrow, who was qualified as an expert witness in arson investigations.  Lieutenant Farrow testified that he arrived at the scene about 4:30 a.m. on May 8, 2005.  He found evidence of a flammable liquid accelerant in two areas of the basement.

After inspecting the water heaters, the furnaces, and the electrical appliances in the basement, Lieutenant Farrow concluded that those things were not the source of the fire and that there was no gas leak which could have contributed to the fire.  He collected a rag and a metal can, both of which had an odor of a flammable liquid accelerant.  The rag subsequently tested positive for gasoline and, according to Lieutenant Farrow, it was the source of ignition. Butane lighters capable of igniting a flammable liquid were found in Petitioner's bedroom on the first floor.  Lieutenant Farrow opined that the fire was intentionally set in the basement, using an open flame device.

Walter Werts' Testimony

The owner of the four-unit building was Walter Werts, who testified that his tenants at the time of the fire were Bonnie Smith, Cornelius Chestnut, and Mr. and Mrs.

2

Dunbar.  Ms. Smith resided with Reginald Childress in unit one on the first floor.

Petitioner was her son.  Mr. Chestnut lived across from Ms. Smith, and the Dunbars

lived in an upper unit.  A fourth unit was vacant.  Mr. Werts explained that a key was

necessary to gain entrance to the basement, but all the tenants had keys to the building

and to the basement.  He was not aware of any problems with the equipment in the

basement, and he did not keep flammable liquids there.

Mr. Werts stated that Ms. Smith and Mr. Childress moved into the apartment

building about two months before the fire.  He (Werts) subsequently received

complaints about Petitioner roaming through the building, breaking a window, and

falling through the attic.  Additionally, there were at least ten police runs to the location

as a result of Petitioner's conduct.  Ms. Smith had confided in Mr. Werts that her son

had psychological issues, that he occasionally would not take his medication, and that

she was trying to get help for him.  On the Friday before the fire, Mr. Werts informed

Ms. Smith that she would have to move because the other tenants were afraid of

Petitioner.

<u>Cornelius Chestnut's Testimony</u>

Mr. Chestnut testified that he was living in apartment two on the night of the fire.

He denied having any problems with Petitioner, but he admitted that Petitioner roamed

around the building and left cigarette butts in the hallway.  He also admitted that he had

complained to the landlord about Petitioner banging on his apartment door and calling

him at home.  On the night before the fire, Petitioner called the fire department.   Mr.

Chestnut did not smell any smoke, and, contrary to what Petitioner told him, there was

no smoke in the hallway.

3

On the following night, Mr. Chestnut heard what he thought was the clothes dryer. Then he heard the smoke detector, and he saw smoke coming through the vent in his bedroom.  On his way out of the building, he saw Petitioner, Bonnie Smith, and Reggie Childress in or near their apartment.  He called the landlord, and a neighbor called the fire department.  He was told that Mr. and Mrs. Dunbar had not made it out of the building.  He denied throwing any accelerants on a cloth or igniting the cloth.

<u>Reginald Childress' Testimony</u>

Mr. Childress testified that he and Ms. Smith moved into unit number one of the apartment building about two months before the fire.  Petitioner had psychological problems and moved into the apartment with them.  On the night of the fire, Petitioner asked Mr. Childress and Ms. Smith to take him to the hospital.  They set out by car and stopped at a gas station where he and Petitioner got out of the car.  He did not think that Petitioner bought anything, and the three of them subsequently left the gas station. They planned to take Petitioner to Sinai-Grace Hospital, but Petitioner wanted to go to Receiving Hospital.  When Petitioner realized that they were not going to Receiving Hospital, he asked to get out of the car.  Mr. Childress complied with Petitioner's request and proceeded to go home with Ms. Smith.  Later, he and Ms. Smith fell asleep on the couch.  Petitioner was not at home at the time.  Petitioner or Ms. Smith subsequently woke him up and said that they thought there was a fire.  He and Petitioner walked through the building looking for a fire.  They saw smoke coming through the vent in Petitioner's bedroom, and when Mr. Childress opened the basement door, flames came out.  They ran outside where Ms. Smith was screaming and calling the Dunbars' names.

4

Mr. Childress went on to say that he and Ms. Smith had planned to move out of the apartment building on the day of the fire. The landlord had returned their May rent and was planning to refund their security deposit. Petitioner knew that they were moving and that the reason for the move was that people in the building were complaining about him.

According to Mr. Childress, Petitioner and Ms. Smith argued on occasion, and Ms. Smith had been trying to get Petitioner out of the house. Mr. Childress thought that Petitioner was "spoiled." He (Childress) and Ms. Smith argued about Petitioner's use of their car without Mr. Childress' permission. Petitioner had a key to the building, but Ms. Smith was trying to have him committed to a facility.

<u>Lance Newman, Terry Grimes, and Derreck Riley's Testimony</u>

Detroit police officers arrived at the crime scene about 4:00 a.m. on May 8, 2005. The fire had been extinguished, and the dwelling was gutted.

Officer Lance Newman attempted to interview Petitioner at the scene, but Petitioner seemed agitated, and he kept trying to interrupt an officer who was speaking with his mother. Petitioner tried to tell his mother what to say and what not to say. When Officer Newman asked Petitioner whether he had been around gasoline, Petitioner responded that he had helped someone get gas for the person's car on the day before the fire. Petitioner left the area when Officer Newman walked over to another officer. Petitioner's mother informed Officer Newman that Petitioner had smelled like gasoline when he got home that night.

Sergeant Terry Grimes saw Petitioner flee from the area as Officer Newman walked away from him. The officers canvassed the area, but were unable to locate

5

him.  One of the arson investigators subsequently informed Sergeant Grimes that there

was a man lying on a bed in the apartment building.  Sergeant Grimes sent Officer

Derreck Riley to investigate.

Officer Riley testified that the person lying on a bed inside the building was

Petitioner.  He arrested Petitioner.  At the time, Petitioner had a cigarette lighter in his

pocket, and he was wearing a white tee-shirt with small burn holes in it.

<u>Bonnie Smith's Testimony</u>

Petitioner's mother, Bonnie Smith, testified that there were no problems with

Petitioner at the apartment building, and she did not recall telling anyone that Petitioner

smelled like gasoline when he arrived home on the night of the fire.  She did admit to

saying at a proceeding on the investigative subpoena that the landlord and tenants

were blaming Petitioner for things that happened at the apartment building.  She also

admitted that, three days before the fire, she had signed a Probate Court petition to

have Petitioner committed.  The petition stated that, as a result of Petitioner's mental

illness, he could reasonably be expected within the near future to seriously injure

himself and others.  She claimed, however, that she signed the petition because

Petitioner had gotten into an altercation with his cousin, and she did not want Petitioner

to go to jail or to be harmed by his cousin.  She preferred to have him taken to the

hospital.

Ms. Smith claimed that she and Mr. Childress were watching television when the

fire started.  She and Cornelius Chestnut then went outside.  Petitioner and Mr.

Childress followed them outside after they discovered smoke coming from the

basement.

6

### Tamera Darden's Testimony

Petitioner's girlfriend, Tamera Darden, testified that Petitioner was at her home from about 1:00 a.m. to 2:40 a.m. on the night of the fire. She also stated that it took Petitioner thirty to forty-five minutes to get home from her place.

### Gregory Sands' Testimony

Convicted felon Gregory Sands testified that he had pleaded guilty to assault with intent to rob while armed in an unrelated case. The plea agreement called for a sentence of five to ten years in prison and the dismissal of two firearm offenses (felon in possession of a firearm and felony firearm) in exchange for Sands' truthful testimony in Petitioner's case and two other criminal cases. In addition, the prosecutor agreed to inform the Michigan Parole Board that Sands was cooperating with the prosecution.

Sands testified that he met Petitioner in jail about a month earlier and that he had four or five conversations with him. Initially, Petitioner stated that he helped his cousin get some gasoline and that his cousin set the fire. Petitioner thought that the police were trying to frame him for the arson. In a subsequent conversation about who set the fire, Petitioner said that he had come from around the house, that his cousin was not there at the time, and that no one saw him. Petitioner said that he used gasoline to set the fire and that the fire got out of control. He then called the 911 operator.

According to Mr. Sands, Petitioner was upset because his stepfather was trying to put him out of their apartment. As for the fire, Petitioner had said that he did not want to kill anybody; instead, he merely wanted to scare his stepfather.

### Timothy Firchau's Testimony

7

Sergeant Timothy Firchau was the officer in charge of the case. He testified that there was no information about Petitioner's cousin in the discovery materials and that the first time he heard anything about Petitioner's problems with a cousin was when Petitioner's mother testified at trial.

<u>Richard Robell's Testimony</u>

Retired police officer and fire fighter Richard Robell testified for the defense as an expert in arson investigation. He explained that he was contacted about the case approximately ten days before he testified. In preparation for trial, he reviewed photographs of the crime scene, the lab report, the transcript of Lieutenant Farrow's testimony at the preliminary examination, and Lieutenant Farrow's report on the cause and origin of the fire. Although he went to the crime scene, the building was boarded up, and he could not get inside. He testified that the lack of vent pipes from the dryers in the basement to the outside could have caused a fire in the basement, but he did not have enough information to say whether the fire was accidental or the result of arson.

<u>John Charles Rayshawn Smith's Testimony</u>

Petitioner testified in his own defense and denied setting the fire. He also denied talking to Gregory Sands about his case, and he denied helping anybody get gas on the night of the crime. He claimed that he was at his girlfriend's house that evening until about 9:00 p.m. and then he went back to the apartment building. His mother refused to allow him to use the car, but she offered to take him to the hospital for a problem with his foot. They went to three gas stations that night, but never made it to the hospital. Ultimately, he got out of the car and caught a bus back to the apartment building. Then, he returned to his girlfriend's house. He was there from about 1:00 or 1:30 a.m.

8

to 3:00 a.m.  When he arrived home, he heard a beeping noise, and he saw smoke

coming from the building.  He entered the house through a window because he did not

have a key to the inside door.  His mother and Mr. Childress were in the hallway.  He

and Mr. Childress ran to the back of the building where black smoke was pouring out of

the basement.  He banged on Cornelius' door and rang the doorbell.  The smoke

choked him, burned his eyes, and prevented him from going upstairs.

Petitioner denied fleeing from the scene or interfering with a police officer who

was interviewing his mother.  He admitted, however, that he knew the landlord had

asked his mother and Mr. Childress to move because he was causing problems.

On July 24, 2006, the trial court found Petitioner guilty, as charged, of two counts

of felony murder and one count of arson of a dwelling house.  The court subsequently

vacated the arson conviction on double jeopardy grounds and sentenced Petitioner to

life imprisonment without the possibility of parole for the murder convictions.  The

Michigan Court of Appeals affirmed Petitioner's murder convictions in an unpublished,

per curiam opinion, see People v. Smith, No. 272821, 2007 WL 3119752 (Mich. Ct.

App. Oct. 25, 2007),[1] and on March 24, 2008, the Michigan Supreme Court denied

leave to appeal because it was not persuaded to review the issues.  See People v.

Smith, 746 N.W.2d 84 (Mich. 2008) (table).

**B.  The Habeas Petition and Responsive Pleadings**

In 2010, Petitioner filed his habeas corpus petition and a motion for equitable

---

[1]  Judge Elizabeth L. Gleicher concurred in the result only.

9

tolling of the statute of limitations.[2]  He argued in his habeas petition that:  (1) there was insufficient evidence at trial to overcome the presumption of innocence and establish that an arson was committed; (2) there was insufficient evidence at trial to establish that he had the necessary state of mind to be found guilty of felony murder; (3) his right to due process of law was violated by the delay in obtaining a defense expert witness; (4) the trial judge relied on hearsay to establish the truth of the matters asserted; and (5) his Sixth Amendment rights were violated by the testimony of a jailhouse "snitch," who allegedly elicited a confession from him in order to obtain favorable treatment for himself.

Respondent moved for summary judgment and dismissal of the petition on the ground that Petitioner did not comply with the one-year statute of limitations.  See 28 U.S.C. § 2244(d).  Petitioner conceded in his motion for a stay that his habeas petition was untimely, but he urged the Court to equitably toll the limitations period on the basis that he lacked mental competence and constructive knowledge of the filing deadline.  In an opinion and order dated February 15, 2011, the Court denied Respondent's motion for summary judgment and dismissal and granted Petitioner's motion for equitable tolling.  The Court concluded that, with equitable tolling for the time that Petitioner was a participant in a residential mental health program, the statute of limitations ran less than a year.  Respondent subsequently filed an answer to the petition, and Petitioner filed a reply.

---

[2]  Petitioner appears to have signed his petition and motion on February 10, 2010, but the documents were not received and filed by the Clerk of the Court until June 29, 2010.

Although Respondent contends that some of Petitioner's claims are procedurally defaulted because Petitioner failed to comply with state procedural rules, a procedural default is not a jurisdictional matter. Trest v. Cain, 522 U.S. 87, 89 (1997). Furthermore, a prisoner may obtain relief on a procedurally-defaulted claim if he or she "demonstrate[s] cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate[s] that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991). The Court "cut[s] to the merits here," using the following standard of review, because "the cause-and-prejudice analysis adds nothing but complexity to the case." Babick v. Berghuis, 620 F.3d 571, 576 (6th Cir. 2010), cert. denied, __ U.S. __, 131 S. Ct. 2121 (2011).

## II.  STANDARD OF REVIEW

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." Harrington v. Richter, __ U.S. __, __, 131 S. Ct. 770, 783 (2011). Pursuant to § 2254, state prisoners are not entitled to the writ of habeas corpus unless the state court's adjudication of their claims on the merits

    (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

11

28 U.S.C. § 2254(d).

> Under the "contrary to" clause [of § 2254(d)(1)], a federal habeas court
> may grant the writ if the state court arrives at a conclusion opposite to that
> reached by [the Supreme] Court on a question of law or if the state court
> decides a case differently than [the Supreme] Court has on a set of
> materially indistinguishable facts.  Under the "unreasonable application"
> clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the
> state court identifies the correct governing legal principle from [the
> Supreme] Court's decisions but unreasonably applies that principle to the
> facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 412-13 (2000) (O'Connor, J., opinion of the Court for

Part II).

"A state court's determination that a claim lacks merit precludes federal habeas

relief so long as 'fairminded jurists could disagree' on the correctness of the state

court's decision."  Richter, 131 S. Ct. at 786 (quoting Yarborough v. Alvarado, 541 U.S.

652, 664 (2004)).  "[E]ven a strong case for relief does not mean the state court's

contrary conclusion was unreasonable."  Id. (citing Lockyer v. Andrade, 538 U.S. 63, 75

(2003)).  To obtain a writ of habeas corpus from a federal court, a state prisoner must

show that the state court's ruling on his or her claim "was so lacking in justification that

there was an error well understood and comprehended in existing law beyond any

possibility for fairminded disagreement."  Id. at 786-87.

### III.  DISCUSSION

### A.  Sufficiency of the Evidence

Petitioner's first, second, and fourth claims challenge the sufficiency of the

evidence presented at trial.  The relevant question on habeas corpus review of a

sufficiency-of-the-evidence claim is "whether, after viewing the evidence in the light

12

most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979) (citing <u>Johnson v. Louisiana</u>, 406 U.S. 356, 362 (1972)) (emphasis in original).

> "<u>Jackson</u> claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference.  First, on direct appeal, "it is the responsibility of the [trier of fact] — not the court — to decide what conclusions should be drawn from evidence admitted at trial. . . . And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the state court decision was 'objectively unreasonable.' "  <u>Ibid.</u> (quoting <u>Renico v. Lett</u>, 559 U. S. __, __, 130 S. Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010)).

<u>Coleman v. Johnson</u>, __ U.S. __, __, 132 S. Ct. 2060, 2062 (2012) (<u>per</u> <u>curiam</u>).

The <u>Jackson</u> standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law."  <u>Jackson</u>, 443 U.S. at 324 n.16.  In Michigan, the elements of felony murder are (1) the killing of a human being, (2) with malice, (3) while committing, attempting to commit, or assisting in the commission of specified felonies.  <u>People v. Carines</u>, 597 N.W.2d 130, 136 (Mich. 1999) (quoting <u>People v. Turner</u>, 540 N.W.2d 728, 732 (Mich. Ct. App. 1995)).

### 1. Evidence that an Arson was Committed

#### a. Arson of a Dwelling House

Petitioner does not dispute that two human beings died as a result of the fire at 7627 Poe Street.  He claims that the prosecutor failed to prove the third element of felony murder:  a killing during the commission or attempt to commit a felony, which, in this case was arson of a dwelling house.  Petitioner urges the Court to disregard

13

Lieutenant Farrow's theory that the fire was caused by an accelerant because the facts or data on which Lieutenant Farrow based his opinion were not in evidence.  The Michigan Court of Appeals disagreed and concluded that "Farrow's testimony was sufficient to enable the trial court to find beyond a reasonable doubt that the fire did not result from natural or accidental causes, but rather, was intentionally and willfully set."  Smith, 2007 WL 3119752, at *2.

Arson is a specified felony in the felony firearm statute, see Mich. Comp. Laws § 750.316(1)(b), and to prove arson of a dwelling house, the prosecution was required to show that:  "(1) a dwelling house was burned, (2) by, or at the urging of, or with the assistance of the defendant, and (3) the fire was willfully or maliciously set."  Gardner v. Kapture, 261 F. Supp.2d 793, 804 (E.D. Mich. 2003) (citing People v. Lindsey, 268 N.W.2d 41, 42 (Mich. Ct. App. 1978)).  "Circumstantial evidence and reasonable inferences arising from the evidence may constitute satisfactory proof of the elements of the offense."  People v. Wolford, 473 N.W.2d 767, 769 (Mich. Ct. App. 1991); see also People v. Horowitz, 194 N.W.2d 375, 376  (Mich. Ct. App. 1971) (stating that, because arson "is usually committed surreptitiously," the "proofs will normally be circumstantial").

The multi-unit apartment building on Poe Street obviously was a dwelling house, and Lieutenant Farrow ruled out an accidental cause for the fire.  He opined that the fire was incendiary in nature, meaning that "it was deliberately set using an open flame device with a flammable liquid accelerant."  (Trial Tr. Vol. 1, 35, June 20, 2006.)  This testimony was sufficient to establish that the fire was the result of arson, because Lieutenant Farrow was qualified to determine the cause and nature of fires, and he

14

personally investigated the crime scene in this case.  He observed the type of burn
pattern which accompanies a flammable liquid accelerant.  He also noticed a rag and a
metal can, both of which smelled like a flammable liquid accelerant.

### b.  Michigan Rule of Evidence 703

Although Petitioner's own expert witness did not dispute Lieutenant Farrow's
opinion, Petitioner maintains that the Court should disregard Lieutenant Farrow's
testimony.  Petitioner points out that the rag and metal can, which Lieutenant Farrow
relied on to form his opinion, were not admitted in evidence.  (Trial Tr. Vol. 6, 5, July 17,
2006.)  Thus, according to Petitioner, there was no physical evidence to support
Lieutenant Farrow's testimony.

Pursuant to Michigan Rule of Evidence 703,

> [t]he facts or data in the particular case upon which an expert bases an
> opinion or inference shall be in evidence. This rule does not restrict the
> discretion of the court to receive expert opinion testimony subject to the
> condition that the factual bases of the opinion be admitted in evidence
> thereafter.

Simply stated, "an expert witness may not base his or her testimony on facts that are
not in evidence."  People v. Unger, 749 N.W.2d 272, 299 (Mich. Ct. App. 2008).  "An
expert witness . . . must have a sound evidentiary basis for his or her conclusions."  Id.
(citing Green v. Jerome-Duncan Ford, Inc., 491 N.W.2d 243, 246 (Mich. Ct. App.
1992)).  His or her "opinion is objectionable if it is based on assumptions that do not
accord with the established facts."  Id. (citing Green, 491 N.W.2d at 499).

Lieutenant Farrow formed his opinion on the basis of several things:  his own
observations; photographs that he and evidence technicians took at the scene; and a
lab report which confirmed that the rag in the basement had gasoline on it.

15

Photographs of the rag and metal can were admitted in evidence without objection. (Trial Tr. Vol. 1, 24-25, 29, June 20, 2006.)  Also admitted in evidence without objection were the lab report about the rag (Trial Tr. Vol. 5, 88, July 13, 2006) and a lighter taken from Petitioner's pocket (Trial Tr. Vol. 3, 35, July 5, 2006).

The Court concludes that Lieutenant Farrow based his opinion on facts or data in evidence.  Therefore, Rule 703 was not violated even though the actual rag and metal can on which Lieutenant Farrow relied were not admitted in evidence.  See People v. Thompson, No. 305760, 2013 WL 276042, at *3 (Mich. Ct. App. Jan. 24, 2013) (unpublished) (concluding that, even though medical records were not in evidence, a physician could give an expert opinion that the victim's impeded breathing was caused by blood in his lungs); People v. Atchison, No. 303721, 2012 WL 1890230, at *1 - *2 (Mich. Ct. App. May 24, 2012) (unpublished) (concluding that DNA experts could testify about their analysis of blood on a tee shirt without the actual shirt being in evidence), appeal denied, 821 N.W.2d 663 (Mich. 2012); In re Micheau, No. 305467, 2012 WL 882453, *5  (Mich. Ct. App. Mar. 15, 2012) (unpublished) (concluding that a physician specializing in pediatric child abuse could testify about the cause and nature of the victim's fractures without the radiology reports being admitted in evidence).

### c.  The Credibility of Witnesses and the Weight of the Evidence

In addition to Lieutenant Farrow's testimony, there was evidence that Bonnie Smith thought Petitioner smelled like gasoline when he arrived home before the fire. And Gregory Sands testified that Petitioner admitted to him that he set the fire. Petitioner claims that his mother and Mr. Sands were not competent witnesses and that both Respondent and the Michigan Court of Appeals misconstrued his claim as a

16

challenge to the admissibility of Lieutenant Farrow's testimony rather than as a

challenge to the weight of Farrow's testimony.  Petitioner wants the Court to evaluate

the weight of Farrow's testimony as an expert witness, but a reviewing court

> does not reweigh the evidence or redetermine the credibility of the
> witnesses whose demeanor has been observed by the trial court.
> Marshall v. Lonberger, 459 U.S. 422, 434, 103 S. Ct. 843, 74 L. Ed.2d
> 646 (1983).  It is the province of the factfinder to weigh the probative value
> of the evidence and resolve any conflicts in testimony.  Neal v. Morris, 972
> F.2d 675, 679 (6th Cir. 1992).  An assessment of the credibility of
> witnesses is generally beyond the scope of federal habeas review of
> sufficiency of evidence claims.  Gall v. Parker, 231 F.3d 265, 286 (6th Cir.
> 2000).

Matthews v. Abramajtys, 319 F.3d 780, 788 (6th Cir. 2003).

In conclusion, a rational trier of fact could have determined from all the evidence,

taken in the light most favorable to the prosecution, that the fire was the result of arson

and that Petitioner intentionally started the fire.  Therefore, the state appellate court's

rejection of Petitioner's claim was neither contrary to, nor an unreasonable application

of, Jackson, and Petitioner has no right to relief on the basis of his first claim.

### 2. Malice

Petitioner alleges next that there was insufficient evidence that he possessed the

state of mind needed to establish felony murder.  Petitioner contends that he had no

malice toward the deceased victims, that he did not intend to hurt anybody, and that he

did not intend to have the fire get out of control.  He also contends that, if Gregory

Sands' testimony is accepted, he (Petitioner) merely wanted to scare his stepfather.

The Michigan Court of Appeals concluded on review of this claim that there was

sufficient evidence of malice to support the felony-murder conviction.

To prove felony murder, the prosecution must establish that the defendant

17

possessed malice.  In felony murder cases, malice is "the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result."  Carines, 597 N.W.2d at 136 (quoting Turner, 540 N.W.2d at 732).  "The facts and circumstances of the killing may give rise to an inference of malice," and the trier of fact may "infer malice from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm."  Id.

Evidence that Petitioner started the fire was sufficient proof of malice.  By starting the fire, he set in motion a force likely to cause death or great bodily harm.  Consequently, the state appellate court's conclusion that there was sufficient evidence of malice was objectively reasonable.

### 3.  Hearsay

#### a.  Petitioner's Argument and the State Appellate Court's Ruling

Petitioner's final challenge to the sufficiency of the evidence pertains to the trial court's alleged reliance on hearsay.  The hearsay came from Walter Werts, the owner of the dwelling that burned.  Mr. Werts testified that tenants in the building had complained to him about Petitioner roaming the building, breaking a window, and falling through the attic and that at least ten police runs were made to the building as a result of Petitioner's behavior.  Mr. Werts also testified that Bonnie Smith had informed him about Petitioner's psychological issues, Petitioner's unwillingness to take his medication, and her attempts to acquire help for Petitioner.  (Trial Tr. Vol. 2, 8-11, June 22, 2006.)

Defense counsel objected to the testimony, and the trial court acknowledged that the testimony was hearsay.  The court then agreed to use the testimony for the limited purpose of showing why Mr. Werts may have taken some action against the Smiths.  The court stated that it was not receiving the evidence for the truth of the matter.  (Id. at 12-13.)  At the close of the trial, however, the trial judge referred to Mr. Werts' testimony when summarizing the evidence.  The court stated that Petitioner had been a problem and that Mr. Werts had said Petitioner was the subject of ten police runs while he was living in the apartment building on Poe Street.  The trial court also mentioned that Mr. Chestnut had complained to Mr. Werts about Petitioner, that Petitioner went into the attic and fell through the ceiling, and that Petitioner had broken windows in other tenants' units.  The court concluded that it was important to look at the circumstances and facts leading up to the fire.  (Trial Tr. Vol. 8, 12-13, July 24, 2006.)

Petitioner contends that the trial court used Mr. Werts' hearsay testimony to establish his guilt.  And because hearsay generally is inadmissible, Mich. R. Evid. 802, Petitioner argues that the trial court violated his constitutional right to be convicted on the basis of sufficient proof.

The Michigan Court of Appeals concluded on review of Petitioner's claim that the trial court's findings were independently supported by nonhearsay testimony and that testimony about the police runs to the apartment building was not hearsay.  The Court of Appeals also stated that, to the extent the trial court considered some hearsay testimony, it was harmless error because the evidence was cumulative.

### b.  Legal Framework and Application

"It is well settled that in a non-jury trial the introduction of incompetent

19

> evidence does not require a reversal in the absence of an affirmative
> showing of prejudice.  The presumption is that the improper testimonial
> evidence, taken under objection, was given no weight by the trial judge
> and the Court considered only properly admitted and relevant evidence in
> rendering its decision."

United States v. Joseph, 781 F.2d 549, 552 (6th Cir. 1986) (quoting United States v. McCarthy, 470 F.2d 222, 224 (6th Cir. 1972)).

Here, the trial court found Mr. Werts' testimony to be inadmissible, but later referred to Mr. Werts' testimony in its findings of fact.  The presumption of regularity accorded a trial court in a bench trial arguably does not apply because the trial court appears to have relied on evidence that it had previously found to be inadmissible.  Id. at 553.

Nevertheless, "'[t]he admission of such evidence is deemed harmless if there is relevant and competent evidence to establish [the] defendant's guilt in [the] absence of the objectionable proof.'"  Id. (quoting McCarthy, 470 F.2d at 224).  The question is whether independent proof of guilt existed.  Id.  On federal habeas corpus review, a constitutional error is harmless unless it had a "substantial and injurious effect or influence" on the verdict.  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

Cornelius Chestnut testified that Petitioner roamed the apartment building, left cigarette butts in the hallway, banged on his door, called him at home without his permission, and made a false alarm about a fire on the day before the actual fire.  (Trial Tr. Vol. 2, 37-42, June 22, 2006.)  And Reginald Childress testified that Mr. Chestnut had complained to him about Petitioner calling his residence.  Mr. Childress also acknowledged that Mr. Werts had asked him and Ms. Smith to move out of the

20

apartment building because the other tenants were complaining about Petitioner.  (Id. at 77, 89-90.)  Even Petitioner's mother, Bonnie Smith, testified at one point that the other tenants had been complaining to her about Petitioner's conduct and that the landlord had blamed the Smiths for broken windows and other things.  (Trial Tr. Vol. 5, 34, July 13, 2006.)

The testimony of Mr. Chestnut, Mr. Childress, and Ms. Smith provided independent evidence that Petitioner caused problems in the apartment building before the fire.  When considered with all the other evidence in the case, there was relevant and competent evidence, apart from the objectionable hearsay, to establish Petitioner's guilt.  The hearsay testimony could not have had a "substantial and injurious effect or influence" on the trial court's ultimate conclusion that Petitioner was guilty as charged. Therefore, the state appellate court's finding of harmless error was objectively reasonable, and Petitioner has no right to relief on the basis of his claim about hearsay testimony.

### 4.  Summary

For all the foregoing reasons, a rational trier of fact could have concluded from the evidence taken in the light most favorable to the prosecution that Petitioner committed felony murder.  The state appellate court's rejection of Petitioner's sufficiency-of-the-evidence claims was objectively reasonable and neither contrary to, nor an unreasonable application of, Jackson.

## B.  The Delay in Obtaining a Defense Expert Witness

As noted above, Petitioner produced an expert witness who testified that he did

not have enough information to form an opinion on the cause of the fire. Because the defense expert witness was not contacted until more than a year after the fire, Petitioner contends that the delay in obtaining the witness's services violated his right to due process.

The Michigan Court of Appeals reviewed this claim for "plain error" because Petitioner did not preserve the claim for appellate review by alleging a due process violation in the trial court. The Court of Appeals concluded that plain error did not occur because there was no evidence that the defense expert witness was denied information or access to the burned building.

### 1. Clearly Established Federal Law

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment,  or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690 (1986) (citations omitted). Whether an indigent defendant in a criminal case has the right to prompt appointment of an expert witness on arson is a different question.

In Ake v. Oklahoma, 470 U.S. 68 (1985), the Supreme Court held that an indigent defendant has a constitutional right to a psychiatrist's assistance when the "defendant [makes] a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial." Id. at 74. But whether the right to a psychiatrist's assistance to support an insanity defense extends to non-psychiatric experts is an open question in the Supreme Court. Babick, 620 F.3d at 579 (citing Caldwell v. Mississippi,

22

472 U.S. 320, 323 n. 1 (1985)).  Because there is no Supreme Court precedent holding

that a criminal defendant is entitled to an expert defense witness on arson, the delay in

acquiring an expert defense witness did not violate Petitioner's right to due process.

### 2. Alleged Ineffective Assistance of Counsel

To the extent that Petitioner blames his attorney for the delay in acquiring an

expert defense witness, he can prevail on his claim only if he shows that his attorney's

"performance was deficient" and "that the deficient performance prejudiced the

defense." Strickland v. Washington, 466 U.S. 668, 687 (1984).  The "deficient

performance" prong "requires showing that counsel made errors so serious that counsel

was not functioning as the 'counsel' guaranteed the defendant by the Sixth

Amendment." Id.  "Judicial scrutiny of counsel's performance must be highly

deferential." Id. at 689.

To demonstrate that counsel's performance prejudiced the defense, Petitioner

must show "a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different.  A reasonable probability is a

probability sufficient to undermine confidence in the outcome." Id. at 694.  "This does

not require a showing that counsel's actions 'more likely than not altered the outcome,'"

but "[t]he likelihood of a different result must be substantial, not just conceivable."

Richter, 131 S. Ct. at 792 (quoting Strickland, 466 U.S. at 693).  The Michigan Court of

Appeals found no basis for concluding that defense counsel was ineffective.

The record indicates that Petitioner's trial attorney acquired the file from another

attorney and began representing Petitioner on March 2, 2006.  (Trial Tr. Vol. 3, 54, July

23

5, 2006.)  On the same day, he began looking for an arson expert.  On June 22, 2006, the second day of trial, defense counsel explained to the trial court that he had been unable to obtain an expert witness because the court's compensation for appointed experts was inadequate.  The trial court offered to help if defense counsel obtained the name of an expert witness and the estimated cost to conduct an investigation.  Defense counsel agreed to do that, and the trial continued.  (Trial Tr. Vol. 2, 3-5, June 22, 2006.)

Richard Robell was contacted at the end of the first week in July of 2006 (Trial Tr. Vol. 6, 10, July 17, 2006) and testified as an expert witness for the defense on July 17, 2006.  Although the crime occurred over a year earlier, it does not appear that the delay in hiring Mr. Robell was defense counsel's fault.  Defense counsel did not begin representing Petitioner until ten months after the crime.  He then set out to obtain an expert witness.  According to him, this process was complicated by the state court's inadequate rate of compensation for appointed expert witnesses.  Petitioner, therefore, has failed to show that defense counsel's performance was deficient.

Petitioner also has failed to show that his attorney's allegedly deficient performance was prejudicial.  The State's expert witness, Winston Farrow, addressed the question of whether the fire could have been caused by something other than arson.  He ruled out the electrical and mechanical equipment in the basement as the cause of the fire. According to him, fire damage was visible on the exterior of the equipment, as opposed to the interior, and certain wires visible in photographs of the crime scene were exposed to fire, as opposed to being the source of the fire.  (Trial Tr. Vol. 1, 41-42, June 20, 2006.)  Lieutenant Farrow found no gas leaks, and he did not

notice an improper hookup in the electrical system.  In addition, the tenants with whom

he spoke said that they did not have any problems with the utilities, electrical service, or

the mechanical equipment in the building.  (Id. at 53-54, 60-61.)

Walter Werts also testified that there were no problems with the equipment in the

basement, and he claimed that he did not keep any flammable liquids there.  (Trial Tr.

Vol. 2, 16-17, 31, June 22, 2006.)  Mr. Childress testified that the furnace was not

working when he and Ms. Smith first moved into the building, but he admitted that, in

his pretrial statement to Lieutenant Farrow, he said there were no problems with the

electrical, mechanical, heating, or plumbing systems in the building.  (Id. at 75-76.)

Richard Robell, on the other hand, testified that a scorch pattern on the hot water

tank was indicative of something being wrong with the burner on the tank.  He also

testified that someone had placed a wire on the circuit breaker to bypass the safety

feature and that a lack of vent pipes from dryers to the outside of the building can

cause a fire.  (Trial Tr. Vol. 6, 14-15, 19-20, July 17, 2006.)  But even Mr. Robell was

unwilling to say whether the opinion of the prosecution's expert witness was wrong or

inconsistent with an accelerant being used.  (Id. at 32-34.)  Furthermore, there was

evidence that Petitioner smelled like gasoline on the night of the fire and, according to

Gregory Sands, that Petitioner actually started the fire.

Given the strength of the evidence produced at trial, there is not a substantial

likelihood that the results of the trial would have been different had Mr. Robell been

contacted earlier and had he testified that the fire started accidentally or through natural

causes.  Petitioner not only has failed to show that defense counsel's performance was

deficient, he also has not shown that counsel's allegedly deficient performance prejudiced the defense. Therefore, the state court's rejection of Petitioner's ineffective-assistance-of-counsel claim was not contrary to, or an unreasonable application of, Strickland.

## C. Petitioner's Alleged Confession

Petitioner's fifth and final claim concerns Gregory Sands, a jailhouse informant who testified about eliciting a confession from Petitioner. Petitioner contends that Sands elicited the alleged confession for the sole purpose of reporting it to the police and obtaining favorable treatment for himself. Petitioner was represented by counsel by then, and because no attorney was present during his conversations with Sands, he contends that his Sixth Amendment right to counsel was violated. The Michigan Court of Appeals adjudicated this claim on the merits and concluded that there was no evidence of government involvement in the solicitation of Petitioner's statements and, therefore, Petitioner's Sixth Amendment rights were not violated.

### 1. Clearly Established Law

A defendant in a criminal case has a Sixth Amendment right to counsel from the time of his or her arraignment. Massiah v. United States, 377 U.S. 201, 205 (1964). This right is violated when a government agent surreptitiously interrogates the defendant and elicits incriminating words from the defendant in the absence of counsel. Id. at 206. In other words,

> a Sixth Amendment violation occurs whenever the State "intentionally creat[es] a situation likely to induce [a defendant] to make incriminating statements without the assistance of counsel," [United States v. Henry,

26

> 447 U.S. 264, 274 (1980)] or "knowing[ly] exploit[s]" a situation in order to obtain incriminating information from a defendant "without counsel being present [.]"  [Maine v. Moulton, 474 U.S. 159, 176 (1985)].

Ayers v. Hudson, 623 F.3d 301, 309 (6th Cir. 2010).  A confession elicited under these circumstances may not be introduced at the defendant's trial.  Massiah, 377 U.S. at 207.   But "the primary concern of the Massiah line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation."  Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).  "There is no constitutional violation when by 'happenstance [] the State obtains incriminating statements from the accused after the right to counsel has attached.'"  Post v. Bradshaw, 621 F.3d 406, 424 (6th Cir. 2010) (quoting Wilson, 477 U.S. at 459), cert. denied, __ U.S. __, 131 S. Ct. 2902 (2011).  Thus,

> a defendant does not make out a violation of [the Sixth Amendment right to counsel] simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police.  Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.

Wilson, 477 U.S. at 459.

When determining whether there was an agency relationship between the State and the informant, a court must analyze the facts and circumstances of the particular case.  Ayers, 623 F.3d at 311.  The court must then ascertain whether an express or implied agreement existed between the State and the informant at the time the informant elicited the incriminating statements from the defendant.  Id. at 311-12.

## 2.  Application

27

Petitioner contends that Gregory Sands was not a passive listener, but that he set out to obtain a confession from him for the sole purpose of reporting it to the police and obtaining favorable treatment in his own criminal case. While this may be true, there is no evidence that state officials encouraged Sands to elicit incriminating information from Petitioner. Rather, the record indicates that Sands was a parolee when he was arrested on February 18, 2006. (Trial Tr. Vol. 5, 74-75, July 13, 2006.) On June 1, 2006, Sands was moved to Petitioner's unit in the Wayne County Jail due to an incident in Sands' former unit. No one in the prosecutor's office or police department asked jail officials to move Sands to Petitioner's unit, and the classification sergeant at the jail received no instructions to move Sands to any particular section of the jail. (Trial Tr. Vol. 4, 26-32, July 7, 2006.)

Sands met Petitioner at the jail on June 8 or 9, 2006. (Trial Tr. Vol. 5, 64, July 13, 2006.) On June 16, 2006, Sands' attorney spoke with someone from the prosecutor's office, and on June 21, 2006, Sands provided a formal statement about Petitioner to the Wayne County Prosecutor's Office and to Detective Sergeant Kevin Nance. Sergeant Nance had no contact with Sands and no involvement in Petitioner's case prior to June 21, 2006. (Trial Tr. Vol. 4, 9-11, July 7, 2006; Trial Tr. Vol. 5, 11-13, July 13, 2006).

On June 22, 2006, Sands was moved out of Petitioner's unit because Petitioner complained about Sands, and Sands was identified as a person testifying against Petitioner. On July 5, 2006, Sands signed a plea agreement, and on July 7, 2006, he pleaded guilty. (Trial Tr., Vol. 4, 11-12, 29-30, July 7, 2006.) The plea agreement

28

called for the dismissal of two firearm charges and a sentence of five to ten years in return for Sands' plea of guilty to assault with intent to rob while armed and Sands' testimony against Petitioner and two other people in unrelated cases.  (Trial Tr. Vol. 5, 61, July 13, 2006.)

At Petitioner's trial, defense counsel initially argued to the trial court that Sands was an agent of the police and that any incriminating statements that Sands elicited from Petitioner were inadmissible because the alleged confession was elicited in the absence of counsel.  (Trial Tr. Vol. 3, 3-9, July 5, 2006.)  But, after the trial court took testimony on the issue, defense counsel changed his position and said, "I must admit that because of the testimony and facts as they dropped, I'm not in any position, nor do I suspect that [Sands] was an agent of the police at the time that he gave the statement . . . ."  (Trial Tr. Vol. 5, 17, July 13, 2006.)   Defense counsel then stated that he was prepared to cross-examine Sands.  (Id. at 18.)

The trial court ruled that Sands could testify, because, in the court's opinion, there was no evidence that Sands was placed near Petitioner for the purpose of eliciting a statement from him.  (Id.)  The trial court's and the state appellate court's determinations that Sands was not an agent of the prosecution is supported by the record, as summarized above.

In conclusion, there is no evidence that the prosecution asked or encouraged Sands to obtain a confession from Petitioner.  Rather, it appears that Sands took it upon himself to elicit incriminating comments from Petitioner and then informed his attorney what he had learned in an effort to obtain favorable treatment in his own case.

29

Because there was no agency relationship between Sands and the State and no secret interrogation attributable to the State, Petitioner's right to counsel was not violated. The state court's decision was not contrary to <u>Massiah</u>.

## IV.  CONCLUSION

For all the reasons given above, the state appellate court's decision was not contrary to clearly established federal law as determined by the Supreme Court, an unreasonable application of clearly established federal law, or an unreasonable determination of the facts. Accordingly, the petition for a writ of habeas corpus (Doc. #1, filed June 29, 2010) is **DENIED**.

## V.  CERTIFICATE OF APPEALABILITY

"[A] prisoner seeking postconviction relief under 28 U.S.C. § 2254 has no automatic right to appeal a district court's denial or dismissal of the petition. Instead, [the] petitioner must first seek and obtain a [certificate of appealability.]" <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 327 (2003).

A certificate of appealability may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." <u>Miller-El</u>, 537 U.S. at 327 (citing <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)).

Reasonable jurists could not debate whether Petitioner's claims should have

30

been resolved differently or whether the claims deserve encouragement to proceed

further.  Accordingly, the Court **DECLINES** to issue  a certificate of appealability.

Petitioner nevertheless may proceed in forma pauperis on appeal if he chooses to

appeal the Court's decision.

s/Marianne O. Battani

MARIANNE O. BATTANI

UNITED STATES DISTRICT JUDGE

Dated: May 2, 2013

CERTIFICATE OF SERVICE

I hereby certify that on the above date a copy of this Opinion and Order was served upon the Petitioner via ordinary U.S. Mail and Counsel for the Respondent, electronically.

s/Bernadette M. Thebolt

Case Manager